All right, our next case is 18-7051 United States v. Hammers. Mr. Ray, you may proceed. Thank you, Your Honor. May it please the Court, my name is Ryan Ray and I represent the defendant and appellant Buck Hammers. I would respectfully request to reserve three minutes of my time in rebuttal. The Court should reverse Mr. Hammers' convictions and sentence on several grounds set forth in our briefing, three of which relate to the trial itself, two of which relate to sentencing. First, the Court should reverse Mr. Hammers' convictions because the from the perpetrator of the fraudulent scheme at the Grant School's Pam Keeling. The note, which was uniquely exculpatory as to Mr. Hammers, was both a statement against interest and it also should have come in under the residual exception to the hearsay rule. The exclusion of this critical exculpatory evidence worked to deny Mr. Hammers' right to present a complete defense. Another aspect of that was the potential testimony of Ms. Miller and as I understand the she eventually did not testify, correct? That's correct, Your Honor. Just from a baseline, Mr. Hammers could have gotten exculpatory evidence before the jury threw her, could he not? It's different in this regard, Your Honor. The statement to... Wait, wait, wait, wait. Answer his question and then go into the differences, you know, if you're disagreeing with him. It was not, it did not have the same exculpatory value, Your Honor, because the note said no vendor nor Mr. Hammers had anything to do with what happened. The statement to Ms. Miller was simply, I did it. Now, of course, Your Honor, where we have a conspiracy, I did it, is not inconsistent with the government's theory. Right, but you've raised a constitutional challenge that you've been denied a defense and you might have been denied an important element of your defense, i.e. the suicide note, but you weren't completely excluded the opportunity to present exculpatory material pointing the finger at Ms. Keeling. Well, Your Honor, under this court's authority and then the Tapaha case, we have to, in answering the question of denial of the right to defense, we have to look at the exculpatory nature of what was excluded and the statement to Ms. Miller did not have the exculpatory value of expressly excluding Mr. Hammers' involvement, which this note did. The note expressly said no vendor nor Mr. Hammers had anything to do with what happened. I don't think anybody would disagree with that point, but the court determined that it lacked sufficient indicia of trustworthiness. You know, how did the court err in that analysis? You know, and we're here on abuse of discretion, right? As to the application of the Federal Rules of Evidence, correct. I would say, Your Honor, that the district court erred in determining that a statement made close in time to a suicide is per se untrustworthy. And there clearly is authority that we have cited the Moore case from the Fourth Circuit. It admitted statements made very close in time to a suicide. So the district court did not engage in a particular analysis of the circumstances of this note. It simply said, it applied a categorical rule that a statement made close in time to a suicide is per se untrustworthy and unreliable. And we would submit that that is an error of law. It's inconsistent with the Moore case. We also cited the Stovall case that's approved the admissibility of a suicide note. In that case, that case was under the residual exception. Moore was under the statement against interest exception. But for the district court to simply say, per se, a statement close in time to suicide is unreliable, we submit that is an error of law. What's the evidence of trustworthiness here? I think there were several things here, Your Honor. Number one is that it is consistent with the statement to the aunt. The government's whole case centered on her involvement in these circumstances, in these fraudulent acts. And in addition, Your Honor, it was found with other notes to her family on a Bible. Again, those are things that the district court never looked at. It did not engage in the analysis of the various factors. But all of those things, the government's entire case, another statement made very close in time, in the circumstances under which it was found, these other statements to her family that were left on a Bible, all indicate its trustworthiness. And further, we would submit, Your Honor, that applying other exceptions, the dying declaration exception for one, by analogy, the fact that it was made close in time to death is an indicia of trustworthiness, not the opposite. Well, are they per se admissible then? I don't believe they are per se admissible, but you have to look at the particular circumstances of the case in question and go through the analysis that's required as opposed to the district court here applying this categorical bar. And I think, Your Honor, when we look- Counsel, I don't see the categorical bar because I think what you hit upon strikes me as what the evidence was showing. But I don't think he just, you know, it's an abuse of discretion. And that's what I'm looking for, is how did the trial court, and you're just saying categorically it was a violation of law. And I'm kind of struggling with that point. And so I need you to go into a little bit more for me to make sure, because to me it more leans toward the factual basis. What did the court have that made him abused as a discretion rather than just saying categorically it was a violation of law? So the court, Your Honor, as to the statement against interest exception simply said, well, penal interest is of no moment to a dead man, relied on the Liminakis case in saying that. I think it's ironic to note that the Liminakis court actually ultimately found that the note there should have come in. I think it did so under an analysis similar to the constitutional framework that we've relied on. But to say that is not consistent with the text of the exception which says we look to the statement when made. And very often you can have people that have unsuccessful attempts at suicide, that change their mind, that are prevented by outside forces. And but if the statement when made, which is what the text of the rule says, when made, Ms. Keeling was alive and it exposed her to civil and criminal liability. So the failure to analyze that was an error of law. And I didn't see that you'd argue that she exposed herself to civil liability. Could you elaborate on that? Well, I think, Your Honor, if it's criminal liability for stealing money, then by the same token that would also certainly support a civil cause of action by the school and perhaps the banks in question. I agree with that, but I didn't see that you argued that in your brief or below. Well, sir, I would just say, Your Honor, criminal liability would, at least in the context of fraud, would always, civil liability for fraud would sort of be a concentric circle inside of that liability. I agree with that, but the her exposure to criminal liability. And we can certainly focus on that and that alone. And the admissions of what occurred are certainly averse to her penal interest at the time that they were made. And so the district court's failure to look at the statement at the time when it made was error. And as it related to the circumstances of trustworthiness, again, I never saw anywhere where the district court engaged in a specific analysis of the statements, the context in which these particular statements were made. It rather made more sweeping commentary about the circumstances of someone who is committing suicide. So if we agreed with you that it was error, why wasn't it harmless error given the evidence against Mr. Hammers? Your Honor, the evidence against Mr. Hammers, we submit, is legally insufficient as a matter of law to the two conspiracy convictions. And so there was an utter lack of sufficient evidence that he was involved in these circumstances. The government was permitted to obtain convictions on essentially an executive negligence type of theory, that he's the senior most person at the school and that these circumstances are going on. And he had a close relationship with Ms. Keeling, ergo, he must have been involved. I thought he signed some checks that were fraudulent. He did not, Your Honor. All we had was people saying that his name appears on checks. We also have the government's own handwriting experts saying there are gross pictorial dissimilarities and unexplained, the presence of characteristics. And we did not have anybody that says, definitively, that he signed these checks. We had people that said it looked somewhat similar, but they weren't sure. No one was able to definitively say that Mr. Hammers, in fact, signed any of these checks. And none of the school district money went into his personal account? It did not, Your Honor. There was not evidence of that at all, that these particular checks went into his bank account. That simply was not there at trial. And we have, Your Honor, this court's decisions, I think, in the Rafai case, in the Rossiparian case. Those cases vary. I mean, Rossiparian, you had the defendant there who actually deposited the fraudulent checks into his account. And that evidence was clearly presented in contrast to this case. But this court in Rossiparian said, that's not enough to demonstrate his actual knowledge and involvement. And so without, with the evidence that was presented, Your Honor, we submit as legally insufficient and requires reversal. But it certainly says that it is not harmless error for the court to have excluded this note, which again, was unique in its exculpatory nature. And Your Honor, I would respectfully request to remain, reserve the balance of my time. You may have your three minutes. Thank you, Your Honor. Good morning, Your Honors. May it please the court, my name is Linda Epperle. I'm an assistant United States attorney in Muskogee, Oklahoma, and I represent the government in this matter. This is a case involving a man who, in connection with his longtime secretary and second in command, embezzled over a million dollars from a small school district in rural Oklahoma that resulted in the closing of the school. There are a number of assertions that were made in the defendant's reply brief about what was and wasn't shown in the record. With the court's indulgence, I'd like to recall, there was some commentary about the defendant not having signatory power over these checks. We'd point out that signatory power would go toward his ability to sign the check on the front. That's not the issue here. The issue here is whether or not he was an endorser on the check. I'm one who said this is not the defendant's signature. We would point the court's direction to five individuals. Rideout, Carter, Story, Cody, and Pugh. Rideout at page 381, Carter at 404, Story at 600 to 603, etc. None of these people said, I saw him sign the check. But these were all people who had known him for years, who in the course of their job as either a school board superintendent or someone else that was a school board employee or a friend in that small community, they'd seen his signature hundreds of times. They said it looks like his signature. They said it is his signature. They said it's similar to his signature. But I believe it would be an unrealistic requirement for the government to have to prove in this kind of case that there was someone who was actually writing his name on that check. What did your expert conclude? The expert, Your Honor, was put on not to prove that that was his signature, but was put on in anticipation of a defense argument. Where's the handwriting expert? We're used to this in the age of CSI. Jurors who anticipate will have expert testimony. So the expert was put on mainly to explain that in today's banking climate, you don't usually get back the original check anymore. We have these electronic copies. And for people who are handwriting analysts, it is extremely difficult, if not impossible, using that electronic image to look at the kind of things they need to look at to determine if it is actually someone's signature. And that is why the expert is put on. Did he give an opinion on the basis of what he had before? He said he was unable to give an opinion. He was unable to give an opinion that that was the defendant's signature, and he explained why. We'd also call the court's attention to the argument that the defendant never deposited any of this money in his accounts. There is one particular $2,900 check that was indicated that that check was deposited into an account where the defendant's regular paycheck gets deposited. And they did that, I believe, off of the account numbers on those checks. You say it was indicated. Did it show it, or did it not show it? It's my understanding of the evidence, and I was not trial counsel. But from reading this extensive record, it's my understanding that that check was deposited into the account where the defendant's paycheck is deposited. We're talking about almost a million dollars here. Was there any evidence that cash deposits were made into his personal accounts, or any demonstration that he was making expenditures beyond his means or ordinary spending habits? There is not proof in the record, to my knowledge, of an analysis of his bank accounts, Ms. Keeling's bank accounts, showing where there were large cash deposits. However, the proof was that many of these checks were cashed. As far as who was living of a lifestyle that would show perhaps a million dollars' worth of unearned gain, the evidence on that consideration strongly weighs toward affirming the decision in this case. Ms. Keeling, who the testimony was would do anything for this man, who'd known him for 20 years, who committed suicide, lived in a double-wide trailer. There's no testimony, to my knowledge, no claim that she had expensive cars, that she had even a gambling addiction, which is what we see in a lot of these cases. I'm not aware of there being any proof of that. The defendant, on the other hand, after a career as a school administrator in these tiny districts in southeastern Oklahoma, had a 400-acre ranch, a house that was Is there any linkage in the record to the crimes alleged here? There was not someone who came and testified, he paid me with a check from the school, or anything of that nature. What we have is the defendant's... What do we know about his personal finances? What we know about his personal finances is that he had this cattle operation. We know that he had... I know, but did he inherit it? Did he co-own it? Was he married and it was his family property for $100? If we don't know, we don't know. There's no indication in the record whatsoever, and he took the stand and testified that he inherited this. His story was, I made it by trading property. In order to trade property up to the point that he had 400 acres, he had to purchase property. And he's certainly, between he and Ms. Keeling, the one who was most skilled at working deals, whether it was for cattle or the property, or what one witness described as the man's big and medium-sized farm machinery. He was the one who had a conspicuous amount of wealth, not Ms. Keeling. You alluded a minute ago to that relationship. What was the facts presented to the jury as to any relationship between her and the defendant in this matter, other than just secretary? They had known each other for years, worked together for over 20 years. There's nothing to try to connect them in any way where she would be trying to, because of a romantic relationship or any kind of relationship. That was never a theory of the government, right? There was no proof of any romantic relationship. It wasn't even presented. No, there was no proof of that. And there being no proof, it's not something that the government would have alluded to. They worked in an office where there were only three or four of them in the office. There is testimony. They spent a lot of time behind closed doors. And when these checks were taken to the bank, they would be presented at the bank, five to seven of them at a time, in individualized envelopes, and the tellers would give them back the check and its corresponding envelope with the cash, etc. So there's time when all of that had to be put together. And I think the inference is that perhaps that's some of what was going on behind those closed doors. Well, but is that anything unusual in a school district, where there's a requirement that monies have to be deposited within 24 hours and has to be separately done? Isn't that normal in school districts? Separating them might be normal. What was different here, Your Honor, is that there was no separation of the purchasing process and running those checks through the school board, even though an audit in 2011, 2012, and 2013 had told them to fix that problem. Okay. What's my next question? What's the inference, then, that a jury can draw from that? The inference that a jury could draw, Your Honor, is that those funds were being... Checks were being cashed. And the strange thing about the checks, and here's where those became important for an inference... Let's don't jump too far ahead because... Yes, Your Honor. All right. If there's an inference, what's the inference that can be drawn against the defendant? He wasn't depositing them or anything that the jury had that they could say, well, yeah, he was involved. I don't see the inference there. The inference is that things were highly unusual. It's not unusual that the superintendent himself might not every day go down and deposit the checks. I mean, that's what he has assistance for. Although the proof was... His own testimony was he would leave a lot of days in the afternoon and go to his ranch. Well, the testimony also shows that a lot of those checks were cashed in the afternoon, checks bearing what appeared to be his signature. That's one problem. The other thing that is an issue here is that the checks would be cashed, but they were checks that if they'd been issued to a normal vendor, they wouldn't have even had time to reach the normal vendor's address. I mean, it made no sense that all these vendors would come in and cash their checks within minutes of one another. How many of those checks are you alleging that Mr. Hammers endorsed and cashed, as opposed to Ms. Keeling, say? There was not a specific number given. There was a teller who said that she cashed checks for him. It said, I believe she said at least a couple of times she cashed some checks. Well, there must have been hundreds of checks, weren't there? There were 120-some-odd exhibits. Some of those were multi-page exhibits, and I think some of those pages had more than one check. So, yes, there were a lot of checks. What percentage were Keeling versus Hammers? I cannot tell you. And that's the nature of the conspiracy. They were working together. We do not know in what way the money was divided up, but given the conspicuous consumption by the defendant, we know that he was certainly getting, or I think the inference would be that he was getting the majority of that money. Let's turn to the suicide note. Yes, Your Honor. That's Mr. Hammers' best evidence. I mean, that's his best shot at an acquittal here, it seems to me. And their argument is that Judge White more or less erected a per se rule, and he said there was a lack of corroboration here. But there was corroboration, wasn't there, because of the statement to Ms. Miller about the self-incriminated Ms. Keeling? Why isn't that enough to satisfy the Rule 804's requirements? Well, the government would disagree that the trial court engaged in a categorical bar. The trial court looked at the Liminakis case and decided that this was not a statement against penal interest. The trial court looked at the possibility of using the residual exception, but the court indicated that the court could not find the note credible or reliable, such that it would justify using that exceptional exception to the hearsay rule. The mindset of a suicidal person, the court was very persuaded by that, that someone who is about to commit suicide is not in a clear mind. Secondly, the court was... I mean, I think that probably goes without saying. I mean, that sounds like a per se rule to me. I think it would depend upon the circumstances of the case. There might be certain types of... Declarations. There's nothing to show that she was extremely emotional or irrational. I mean, she had a conversation with her aunt. Her aunt, yes, Your Honor. And said, you know, within what, 24 hours of the note, that said, you know, I'm culpable. Part of the problem here... That seems to cut the other way that shows, you know, it's a statement against penal and civil interest, right? Because she's exposed herself to jail and to, you know, presumably civil exposure for the extorted money, so... We have a couple of problems. The defendant has a couple of problems with this argument. First of all, this is not as if she was making a claim about a specific check or a specific note or a specific anything. She said, what happened at the school was my responsibility. You know, defendant had nothing to do with it. It's very... We don't know for certain that she's even talking about the financial scheme. It could have been any number of things. I mean, the best... What else is there? The inference is that that's what it would be. But it's a very generalized statement, so we don't know. He may have been doing things, in addition, she didn't know about. That's true, but the court then turned around and was going to admit Ms. Miller's testimony that, you know, has those same flaws, and that's corroborated. I mean, how do you square allowing Ms. Miller to testify with the exclusion of the suicide note? Actually, one's more specific and more exculpatory versus the other. One clear difference is that Ms. Miller would be subject to cross-examination. That is the clear difference. With the suicide, this woman took herself and attempted to take her person that she cared about greatly out of the equation. She deprived us of the ability to prosecute her. The difference with Jimmy Sue Miller and the court... You know, the government didn't believe that Jimmy Sue Miller should testify, and there was a long discussion about that, but the court believed that her testimony could be reliable. She would be subject to cross-examination. She also, potentially, it would be a statement against interest because there was a question as to whether or not she was involved. Does the record disclose at all why the defense did not call her? No, Your Honor. There was a long discussion about it, but I don't believe that Mr. Goettcher gave the reasons. Thank you, counsel. Your time has expired. Mr. Ray, you have three minutes. Counsel, without asking, I'd like for you to answer the question, does the record show any reason why you did not call the aunt as a witness? I'm just asking you, does the record? It does not. Okay. It does not, Your Honor. That record is not disclosed. On the question of the suicide note and its alleged vagueness, I would just like to point out to the court that it says, I, Pam Keeling, take full responsibility for everything at Grant School. So it wasn't everything is the word that's used. And then on the question of we don't know what it's involved in, it says no vendor, these were all vendors that were presented at trial and supposedly involved, nor Mr. Hammers had anything to do with what happened. It's clear to me what's being referred to, and it's not just some vague assertion of something. But it's also clear that you did have the opportunity and chose not to call the aunt. Is that correct? We had the opportunity to call the aunt, but, Your Honor, I would just say that the Ms. Keeling statement to the aunt did not exculpate Mr. Hammers. That's the distinction. Well, I understand that. But still, nonetheless, you had that opportunity and chose not, in your defense, to call her. The trial counsel chose not to call Ms. Miller. Again, her statement was not as exculpatory. Now, on sufficiency of the evidence, what we heard a lot in the government's briefing here today about the relationship between Ms. Keeling and Mr. Hammers, and I would just like to invite the court and direct to a statement from the Refai case, where this court said, reliance on Mr. Refai's relationship with Mr. Ohaka runs the risk of impermissible guilt by association. That was a fraud case in which the court reversed, based upon insufficiency of the evidence, and simply said that the relationship between these two gentlemen there was not enough. That was not constitutionally sufficient evidence of a conspiracy. And I think it's very similar here. And we had the Austin case and the Ross-Saperian case. And both of those cases said, look, even if the defendant should have known that something awry was going on, that is not sufficient to prove, beyond a reasonable doubt, that the defendant willfully and knowingly entered into a conspiracy. But Ms. Epperle said that there was at least one check for around $3,000 that went into his personal account. Your Honor, I believe the evidence actually showed, and I think that's on pages 415 through 17 of our appendix, that that check was cashed. I believe what Ms. Epperle was referring to is a report by an auditor much earlier. And when the actual evidence developed, that may have been what the auditor thought at a historical point in time. But when the actual evidence played out at trial, I don't believe it showed that Mr. Hammers actually deposited that check. And I believe the defense actually introduced an exhibit of his bank account records, and that check was not there. Okay. Check it out. Thank you. Your time's expired. We appreciate the arguments. Counselor, excused? No, I was going to say, very good. Thank you. Counselor, you're excused. Thank you. Case shall be submitted.